**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| HEATHER HOSKINS, | CASE NO. 3:25-CV-00976-JJH |
| Plaintiff, | DISTRICT JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. |  |

Plaintiff Heather Hoskins seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I.    Procedural History

Ms. Hoskins filed an application for DIB on June 13, 2022, alleging a disability onset date of May 8, 2017.[1]  (Tr.  191.)  She later amended the alleged onset date to December 2, 2020.  (Tr. 457.)  Ms. Hoskins alleged disability due to fibromyalgia, chronic pain, plantar fasciitis, heel spurs bilateral feet, borderline personality disorder, cognitive issues, depression, anxiety, sleep

---

[1] Ms. Hoskins filed previous applications for DIB and Supplemental Security Insurance in 2017, which were denied by an ALJ on December 1, 2020.  (Tr. 145-76.)

1

apnea with daytime fatigue, shoulder impingement, nausea, mobility issues, mild degenerative arthritis in the cervical spine, degenerative joint disease in bilateral hips, right torn labrum in shoulder, left shoulder tingling/numbness, asthma, irritable bowel syndrome ("IBS"), obesity, insulin resistant diabetes, sleep apnea and narcolepsy with cataplexy.  (Tr. 178, 192.)  She also alleged that the severity of her pain increased as of August 2022, that walking and standing were extremely painful, and that she needed assistance to get up from a sitting position.  (Tr. 192.)

Ms. Hoskins's application was denied initially (Tr. 191) and upon reconsideration (Tr. 202).  She requested a hearing (Tr. 293), and a telephonic hearing was held before an Administrative Law Judge ("ALJ") on September 28, 2023 (Tr. 86-144).  On March 12, 2024, the ALJ issued a decision finding Ms. Hoskins has not been under a disability within the meaning of the Social Security Act from December 2, 2020, through December 31, 2022, the date last insured.  (Tr. 58-79.)  Ms. Hoskins requested review of the ALJ decision by the Appeals Council.  (Tr. 336-37.)  On March 12, 2025, the Appeals Council declined to review the ALJ decision, making it the final decision of the Commissioner.  (Tr. 1-7.)

Ms. Hoskins filed the present Complaint on May 13, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 13, 15, 16).  Ms. Hoskins raises the following assignments of error:

(1) The ALJ erred when he applied an incorrect legal standard to his analysis of Plaintiff's migraines and subsequently failed to properly evaluate the appropriate and analogous Listing 11.02;

(2) The Residual Functional Capacity ("RFC") assessment is not supported by substantial evidence where the ALJ failed to account for all limitations resulting from migraines; and

(3) The Plaintiff's RFC is not supported by substantial evidence where the ALJ failed to properly evaluate Plaintiff's subjective statements and thereby violated SSR 16-3p.

(ECF Doc. 13, p. 5.)

2

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Hoskins was born in 1972 and was 48 years old on the amended alleged disability onset date, making her a younger individual under Social Security regulations. (Tr. 178, 192.) She had at least a high school education. (Tr. 391.) She has not worked since May 8, 2017, the original alleged onset date. (Tr. 178, 192.)

### B. Medical Evidence

#### 1. Treatment History Prior to Alleged Onset Date[2]

According to an August 1, 2018 treatment note from Ms. Hoskins's primary care physician Nadia A. Warsi, M.D., at Mercy Hospital Physicians, Ms. Hoskins was seeing a neurologist for chronic headaches. (Tr. 658.) Earlier in 2018, she had received Botox injections and other injections in her neck and back as treatment. (*Id.*; *see* Tr. 882-83 (record of cranial nerve blocks in May and August 2018 to treat headaches and neck/shoulder pain).) She had tried gabapentin, Lyrica, and Cymbalta to treat the pain, but they were not tolerated, and a one-week course of Medrol from her neurologist to treat a fibromyalgia flareup had not made "much of a difference." (Tr. 658.) Dr. Warsi conducted a physical examination that showed no gait problem, no pain on palpation over the calcaneus or plantar surface of the foot, no swelling at the ankles or feet, and intact sensation in bilateral feet. (Tr. 659-60.)

On February 25, 2019, Ms. Hoskins presented to Kiran Chary Tamirisa, M.D., for a pain assessment at Mercy St. Charles Pain Management. (Tr. 604-11.) She complained of neck pain

---

[2] While Ms. Hoskins alleged, and the ALJ found, physical and mental health impairments (Tr. 65, 178, 192), Ms. Hoskins's arguments are based on her physical impairments, primarily migraines (ECF Doc. 13). The Court's summary is generally limited to the evidence cited in the parties' briefs that is relevant to the legal and factual issues before the Court. To the extent Plaintiff cites to medical records that were submitted to the Appeals Council but were not before the ALJ (*see* ECF Doc. 13, pp. 4-5 (citing Tr. 10, 14-15)), those records are not considered in the undersigned's review of the ALJ decision.

and generalized body aches that had been ongoing for about 20 years.  (Tr. 604.)  She reported pain on her entire body, including joints, skin, and muscles, and severe migraine headaches that caused nausea at times.  (*Id.*)  She was taking Tramadol only during severe migraines because she did not like to take narcotics.  (*Id.*)  Her average pain was about a six on a scale of one to ten.  (Tr. 605.)  On physical examination, she displayed a supple neck, normal range of motion, muscle tone and coordination, abnormal gait, and no atrophy, tremor, abnormal reflexes, or sensory deficit.  (Tr. 607.)  Motor strength was somewhat weak in the hand grip, but strength was otherwise equal in all muscle groups.  (Tr. 608.)  Range of motion of the back was limited and painful in all directions, and straight leg tests were negative bilaterally.  (Tr. 608-09.)  Dr. Tamirisa reviewed back and foot x-rays that showed minimal-mild degenerative changes in the lumbar spine and similar degenerative changes of the calcanei with no radiographic evidence of acute osseous abnormality of the right or left calcanei.  (Tr. 609.)  He recommended further scans of the foot and lumbar spine and physical therapy.  (Tr. 610.)

On September 2, 2020, Ms. Hoskins saw Nitin Goyal, M.D., at MP Pain Management Clinic.  (Tr. 3167-71.)  She presented with left flank pain following dry needling and reported no relief.  (Tr. 3169.)  Her pain was 6/10 and exacerbated by laying on her side, standing or "walking briskly."  (*Id.*)  Ice and heat had provided no relief, but ibuprofen had helped some. (*Id.*)  Ms. Hoskins also reported muscle aches and weakness, joint pain, and back pain but no swelling or headaches.  (Tr. 3170.)  She had experienced continued relief from right shoulder pain following steroid injections in July 2020.  (Tr. 3169.)  X-rays from August 2020 showed no abnormalities in the ribs, mild degenerative arthritis in the mid and lower cervical spine, loss of normal cervical lordosis, and no acute bony pathology.  (Tr. 3169-70.)  Her physical examination noted tenderness to palpation below the rib cage, intact range of motion with pain in the left

4

flank areas with lateral flexion of waist to the right, tenderness to palpation over the greater trochanter, intact hip flexion, extension, and external rotation with mild pain, 5/5 all around motor strength, normal gait, and intact sensation in the lower extremities.  (Tr. 3170.)  Dr. Goyal recommended trigger point injections and physical therapy.  (*Id.*)

### 2. Treatment History After the Alleged Onset Date

Ms. Hoskins attended a rheumatology appointment on January 27, 2021, with Yue Ding, M.D.  (Tr. 3142-46.)  She reported overall body pain, mostly in the neck and shoulder areas as well as hip pain, which Plaquenil had not helped.  (Tr. 3145.)  Recent x-rays showed osteoarthritis in the hips.  (*Id.*)  Ms. Hoskins also reported headaches with blurry vision.  (*Id.*)  On physical examination, she had normal range of motion with pain in the shoulders, pain with movement in the elbows, and a normal range of motion in the hands, knees, and ankles with no effusions.  (*Id.*)  All other body systems were normal.  (*Id.*)

On February 12, 2021, Ms. Hoskins attended a new-patient examination with Vicki A. Ramsey-Williams, M.D., and Sihyeong Park, M.D., at ProMedica Neuroscience Center Physicians.  (Tr. 1059-64.)  She had been referred after reporting left-arm numbness and weakness to her rheumatologist in January 2021 and showing a positive Hoffman's sign.  (Tr. 1060.)  Ms. Hoskins reported that her left arm weakness and numbness had improved but she still felt numbness in the left shoulder.  (*Id.*)  A neurological physical examination showed full orientation, grossly normal strength with some give way weakness, paresthesia in the left deltoid area, brisk reflexes in the extremities except for the left upper, with Hoffman's sign on the right side.  (Tr. 1063.)  An MRI of the brain and cervical spine from 2019 and an MRI of the right shoulder from 2020 were reviewed: the former was unremarkable, and the latter showed labral tear and adhesive capsulitis.  (*Id.*)  Given the normal bran scan, Dr. Park determined that Ms.

Hoskins's hyperreflexia, Hoffman's sign, and ankle clonus could be physiologic and requested an EMG/NCS report. (*Id.*)

On July 22, 2021, Ms. Hoskins presented to her podiatrist Kim Nadaud, DPM, at Mercy Health Physicians for a follow-up appointment. (Tr. 578-80.) She reported constant, 8/10, left foot pain for the previous two months. (Tr. 578.) Dr. Nadaud noted a gait problem and joint swelling, but Ms. Hoskins was negative for confusion, headaches, weakness, and numbness. (Tr. 579.) On a lower extremity physical examination, Ms. Hoskins had normal strength bilaterally, intact sensation, reduced range of motion in the first metatarsophalangeal joint bilaterally, pain on palpation of the left posterior heel along the Achilles tendon and plantar fascia, normal arch, limited dorsiflexion in the left ankle, and dorsally contract digits absent digits 1-5 bilaterally. (Tr. 580.) Dr. Nadaud recommended physical therapy and proper shoe gear and gave Ms. Hoskins a posterior night splint for stabilization and compression. (*Id.*)

On November 30, 2021, Ms. Hoskins was sent to ProMedica Flower Hospital emergency department after presenting at urgent care with flank pain, passing a kidney stone, chills, diarrhea, vomiting, headaches, lightheadedness, and falling down the stairs. (Tr. 1022-26; Tr. 1029 (urgent care visit).) She denied any trauma from falling, and she demonstrated full strength, normal coordination, and intact nerves on examination. (Tr. 1025.) After labs and scans came back normal, she was diagnosed with a viral syndrome and lightheadedness and discharged with return precautions and instructions to follow up with her PCP. (*Id.*)

On January 31, 2022, Ms. Hoskins saw Naeem A. Lughmani, M.D., at Sleep Medicine Lughmani Sylvania to follow up on her sleep problems. (Tr. 2325-29.) Dr. Lughmani educated Ms. Hoskins on managing GERD and mild asthma symptoms, sleep hygiene, and preparing for an upcoming sleep study; she also refilled medications for narcolepsy and started Ms. Hoskins

on a new Breo Ellipta inhaler to treat chronic cough. (Tr. 2325.) Ms. Hoskins reported headache and vertigo (Tr. 2329) and denied joint stiffness or pain (Tr. 2328). A physical examination showed normal gait and stance and overall normal musculoskeletal system. (Tr. 2327.)

On April 2, 2022, Ms. Hoskins presented to the Mercy Hospital St. Anne ER after she hit the back of her head on a wall while giving a child a piggyback ride. (Tr. 571.) On examination, her motor function and coordination were intact, and she was negative for dizziness, weakness, lightheadedness, and numbness. (Tr. 573-74.) A CT scan of her head revealed no intracranial abnormality, infarction, hemorrhage, or lesion. (Tr. 575.) Her wound was cleaned and stapled (Tr. 576), and she was discharged with instructions to follow-up with her PCP (Tr. 577).

On May 5, 2022, Ms. Hoskins presented to her podiatrist Dr. Nadaud for a follow-up appointment. (Tr. 563-66.) She chiefly complained of constant, 10/10, bilateral heel pain in the previous three weeks. (Tr. 564.) She did not report any headaches, weakness, or numbness. (Tr. 565.) A lower extremity physical examination showed: normal strength bilaterally; reduced range of motion in the first metatarsophalangeal joint bilaterally; pain on palpation on the left and right Achilles tendons and left plantar medial calcaneal tuberosity; increased pain with dorsiflexion of the right and left lesser toes; and normal arch and ankle range of motion bilaterally. (Tr. 566.) The exam also showed hypersensitive sensation to light touch bilaterally. (*Id.*) Dr. Nadaud recommended physical therapy, dry needling to treat tendinitis and plantar fasciitis, and a referral to rheumatology to treat fibromyalgia. (*Id.*)

On August 4, 2022, Ms. Hoskins attended a sleep management follow-up appointment with Dr. Lughmani. (Tr. 2316-20.) Her examination showed an overall normal musculoskeletal system with normal gait and stance and no irregularities in the neck. (Tr. 2318.) Ms. Hoskins denied joint pain and stiffness but reported vertigo and headache. (Tr. 2319-20.)

On November 14, 2022, Ms. Hoskins presented to Erin N. Williams, APRN-CNP, at Promedica Wellness Center.  (Tr. 2688-90.)  She complained of all over joint pain for 25 years, most recently in her hips, knee, and elbows.  (Tr. 2688.)  She also reported foot pain and requested referrals to a new podiatrist and rheumatologist.  (*Id.*)  She complained of arthralgia and joint swelling, but not back pain, neck pain or stiffness, dizziness, tremors, weakness, numbness, or headaches.  (Tr. 2688-89.)  Her physical examination revealed normal range of motion, no sensory deficits, no weakness, and no swelling or tenderness.  (Tr. 2689-90.)  She was referred to a podiatrist and a rheumatologist.  (Tr. 2690.)

Ms. Hoskins attended a medication follow-up appointment with Dr. Lughmani on December 8, 2022.  (Tr. 3018-3023.)  Dr. Lughami reinforced the importance of good sleep hygiene, refilled medications for narcolepsy, hypersomnia, and chronic cough, and prescribed a new BIPAP machine to treat sleep apnea.  (Tr. 3018.)  A physical examination was normal throughout, including overall normal musculoskeletal system.  (Tr. 3021.)  Ms. Hoskins reported headache but denied joint pain and stiffness.  (Tr. 3023.)

Throughout the disability period, Ms. Hoskins attended medical appointments at which physical examinations showed full or near full strength, full range of motion, normal coordination, normal movement, and/or a normal gait.  (*See, e.g.*, 1039 (September 2021), 1020 (January 2022), 1015 (March 2022), Tr. 1013 (April 2022), 2321-24 (June 2022).)

### 3. Opinion Evidence

On October 30, 2022, state agency medical consultant Leon Hughes, M.D., opined that Ms. Hoskins had the physical RFC to perform light work subject to the following additional limitations:  occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; occasionally balancing, stooping, kneeling, crouching, and crawling; occasionally reaching in all directions on

the right and overhead on the left; frequently handling, fingering, and feeling bilaterally; avoiding concentrated exposure to fumes and hazards; and being near a bathroom due to IBS. (Tr. 187-88).  On February 5, 2023, on reconsideration, Linda Hall, M.D., affirmed Dr. Hughes's findings.  (Tr. 198-99.)

**C.      Hearing Testimony**

At the hearing on September 28, 2023, Plaintiff testified in response to questioning by the ALJ and her attorney.  (Tr. 94-134.)  When asked if she was still having migraine headaches, she answered: "I have the migraines, but I don't have them as bad."  (Tr. 125.)  She explained that she had migraines "[a]bout two times a month," lasting "several hours to overnight."  (Tr. 125-26.)  Her reported symptoms included extreme light sensitivity and nausea / vomiting.  (*Id.*)  She was not taking any medications for the headaches, other than her existing pain medications, but was on birth control to reduce the frequency.  (Tr. 126.)

A Vocational Expert ("VE") also testified.  (Tr. 134-42.)  The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform representative positions in the national economy, including cleaner, housekeeping, mail clerk, and routing clerk.  (Tr. 136-37.)  If the individual were limited to the same RFC restrictions at a sedentary level of exertion, available positions would include document preparer, circuit board inspector, and sorter.  (Tr. 137.)  The VE also testified that being off task 15% of the time or absent more than one day a month on an ongoing basis would preclude competitive employment.  (*Id.*)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

9

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

### IV.    Law & Analysis

**A.    Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.     First Assignment of Error: The ALJ Did Not Err When He Evaluated Plaintiff's Migraines at Step Three of the Sequential Analysis**

Plaintiff argues in her first assignment of error that the ALJ erred as a matter of law and that his decision at Step Three is "devoid of any reasoning" because the ALJ did not "make a specific finding regarding medical equivalence between Plaintiff's headaches and Listing 11.02." (ECF Doc. 13, pp. 7-10.)  She further argues that this error was not harmless because her headache impairment medically equals Listing 11.02.  (*Id.* at pp. 11-16.)  The Commissioner responds that a review of the ALJ's whole decision shows he considered medical equivalence, and that Plaintiff has failed to show that her headache impairment medically equals Listing 11.02.  (ECF Doc. 15, pp. 6-9.)  In reply, Plaintiff continues to assert that the ALJ applied an incorrect legal standard to his Step Three analysis.  (ECF Doc. 16, pp. 5-7.)

12

### 1.      Legal Framework for Step Three Evaluation of Headaches

At Step Three of the disability evaluation, a claimant is disabled if her impairment meets or equals one of the listings in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)).  The claimant bears the burden to prove that her condition meets or equals a listing.  *See* 20 C.F.R. § 404.1520(d); *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)).  To do so, she "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

While there is no listing for headaches, Social Security Ruling ("SSR") 19-4p provides guidance on how "primary headache disorders" such as migraines are established and evaluated, explaining: "While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." SSR 19-4p, 84 Fed. Reg. 44667, 44667-71 (Aug 26, 2019).  While a claimant cannot "meet" a listing for headache—as no such listing exists—her headaches could "medically equal" Listing 11.02 for epilepsy.  *Id.*  SSR 19-4p further addresses the application of Paragraphs B & D of Listing 11.02 to headaches as follows:

> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: a detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms);

the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

(*Id.*)

To meet her burden to show that an impairment medically equals a listing, Ms. Hoskins must prove that "the findings related to [the] impairment(s) [were] at least of equal medical significance to those of a listed impairment."  20 C.F.R. § 404.1526(b)(2).  Further, before an ALJ can find she medically equals a listing, the record "must" contain one of the following:

1.  A prior administrative medical finding from [a state agency medical consultant] or [psychological consultant] from the initial or reconsideration adjudication levels supporting the medical equivalence finding, or

2.  [Medical expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearings level supporting the medical equivalence finding, or

3.  A report from the [Appeals Council]'s medical support staff supporting the medical equivalence finding.

SSR 17-2p, 82 Fed. Reg. 15263, 15265 (March 27, 2017).  Thus, an ALJ may only find medical equivalence at the hearing level if the record contains supportive medical opinion findings from either a state agency consultant or a medical expert.  *Id.*  And if the ALJ "believes the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a

14

listed impairment," SSR 17-2p provides that the ALJ need not obtain medical expert evidence, and in fact need not even "articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.*

### 2. The ALJ Appropriately Evaluated Plaintiff's Migraine Headaches

The ALJ identified migraine headaches as a severe impairment (Tr. 65), but found none of Ms. Hoskins's impairments met or medically equaled a listing at Step Three, explaining:

> The claimant's impairments have been evaluated in the context of the Listings, including but not limited to Listings 1.15 & 1.18, to determine whether the claimant's impairments, singularly or in combination, meet or medically equal one of the listed impairments. Additionally, the claimant has diagnoses of fibromyalgia and chronic pain syndrome, which I have considered under SSR 12-2p & 03-02p, which instructs adjudicators on the analysis of these diagnoses. Further, with respect to the claimant's headaches, although there is no listing for a primary headache disorder, I have considered this impairment under SSR 19-4p, which instructs adjudicators on the analysis of a primary headache disorder. Considering the claimant's impairments, including fibromyalgia, chronic pain syndrome and headaches, and their effects on her other impairments, I find that the claimant does not manifest clinical signs and findings that meet the specific criteria of any of the listings.

(Tr. 67.)  Plaintiff argues these findings were in error because: (1) the ALJ did not explicitly cite to Listing 11.02; (2) the ALJ did not explicitly say he considered whether Plaintiff's headaches "medically equal" a listed impairment; and (3) the evidence shows Ms. Hoskins met equivalency requirements for Listing 11.02 under SSR 19-4p.  (ECF Doc. 13, pp. 7-16.)  For the reasons explained below, the undersigned concludes that none of these arguments are well taken.

First—as to whether the ALJ erred by not specifically citing Listing 11.02—while the ALJ did not cite Listing 11.02, he did explain that he "considered th[e] [headache] impairment under SSR 19-4p, which instructs adjudicators on the analysis of a primary headache disorder." (Tr. 67.)  And SSR 19-4p instructs that "[w]hile uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph

15

B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." 84 Fed. Reg. at 44667-71. The ALJ thus sufficiently referenced Listing 11.02.

Further, the Sixth Circuit has explained that an ALJ need not discuss a listing if the record does not "raise[] a substantial question concerning whether the claimant could meet or equal the listing." *Heart v. Comm'r of Soc. Sec.*, No. 22-3282, 2022 WL 19334605, at *2 (6th Cir. Dec. 8, 2022) (citing *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014)). Under this standard, "[t]o show that an ALJ committed reversible error by failing to consider a listing, a claimant must point to specific evidence demonstrating that he could reasonably meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432-33. Thus, even if the ALJ's reference to SSR 19-4p were insufficient to show that he considered Listing 11.02, that error would only be "reversible" if Ms. Hoskins "point[s] to specific evidence demonstrating that [s]he could reasonably meet or equal every requirement of the listing." *Id.* For the reasons discussed in response to the third argument below, she has not met this burden.

Second—as to whether the ALJ erred by finding "[c]onsidering the claimant's impairments, including . . . headaches, . . . that the claimant does not manifest clinical signs and findings that *meet* the specific criteria of any of the listings" (Tr. 67 (emphasis added)) without also explicitly finding the headache impairment did not *medically equal* a listing—the ALJ explicitly found in the numbered heading for his Step Three analysis that "the claimant did not have an impairment or combination of impairments that met *or medically equaled* the severity of one of the listed impairments" (*id.* (emphasis added)). SSR 17-2p specifies that the ALJ need not "articulate specific evidence" supporting his finding that an impairment did not medically equal a listing so long as he "believed the evidence d[id] not reasonably support" such a finding. 82 Fed. Reg. at 15265. Thus, so long as the record contained substantial evidence to support a

16

finding that medical equivalence under Listing 11.02 was not "reasonably support[ed]," the ALJ was not required to provide any further explanation regarding his medical equivalency findings.

Finally—as to whether Ms. Hoskins has "point[ed] to specific evidence demonstrating that [s]he could reasonably meet or equal every requirement of" Listing 11.02 as contemplated in SSR 19-4p, *Smith-Johnson*, 579 F. App'x at 432-33—the undersigned concludes that she has not met this burden for several reasons. First, as the Commissioner points out, SSR 17-2p provides that the record "must" contain a finding of medical equivalence by a state agency consultant at the initial or reconsideration level or a medical expert at the hearing level before an ALJ may find that a claimant medically equals a listing. SSR 17-2p, 82 Fed. Reg. at 15265. Here, the state agency consultants did not provide such a finding (Tr. 184, 186, 195, 196), and no medical expert testimony was obtained.[3] Plaintiff's argument that "the evidence could reasonably support a finding that migraines medically equal Listing 11.02(D)" therefore must fail.

Further, the evidence she cites in support of the proposed medical equivalence finding is largely limited to her own subjective reports and treatment records from outside the alleged disability period. For example, in support of a finding that she continuously suffered from migraine headaches during the alleged disability period, she cites only to a treatment record from 2018 (predating the alleged onset by two years) and a medical record from 2024 that was not in the evidentiary record before the ALJ (post-dating her date last insured by two years). (*See* ECF

---

[3] Although Plaintiff does not address the issue in her brief, the undersigned notes that the ALJ had no obligation to obtain medical expert evidence so long as he "believe[d] the evidence d[id] not reasonably support a finding that the individual's impairment(s) medically equal[ed] a listed impairment." SSR 17-2p, 82 Fed. Reg. at 15265. Plaintiff's only reference to the issue is a vague statement in her reply brief that "in the alternative, . . . the ALJ had the duty to develop the record to obtain necessary evidence." (ECF Doc. 16, p. 6.) Any argument that the ALJ had a duty to obtain medical expert testimony was waived both because it was vague and underdeveloped and because it was raised for the first time in a reply brief. *See Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 (6th Cir. 2021) ("[E]ven well-developed arguments raised for the first time in a reply brief come too late."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations omitted) (alterations in original).

Doc. 13, p. 11 (citing Tr. 10, 658).)  In support of her reported treatment with prescribed medications and "invasive" nerve blocks, she cites treatment records from 2018.  (*See id.* (citing Tr. 73, 882).)  In support of her complaints to providers about tremors, weakness, and headaches, she cites a treatment record from 2019.  (*Id.* at p. 14 (citing Tr. 607).)  In support of her assertion that she adhered to treatment with little improvement, she cites to her own testimony (*id.* at p. 15 (citing Tr. 126)), treatment records from 2018 and 2019 (*id.* (citing Tr. 604, 882)), and a single treatment visit for heel pain during the alleged disability period where her past medical history includes a listed diagnosis of "Migraine" and a list of prior medications includes Toradol and Zofran (*id.* (citing Tr. 565)).  The only evidence cited to support her reported symptoms during the alleged disability period is her own hearing testimony.  (*Id.* at pp. 13-14 (citing Tr. 125-26).)

The limited evidence cited by Ms. Hoskins is insufficient to show that she could reasonably equal every requirement of Listing 11.02.  *See Smith-Johnson*, 579 F. App'x at 432-33.  She asserts that her headache impairment medically equals Listing 11.02(D) under SSR 19-4p because the headaches occurred twice a month, "cause[d] her to be extremely photophobic and nauseous, and she must find a dark and quiet place," and continued despite her adherence to treatment.  (*Id.* at p. 11.)  But SSR 19-4p explains that a finding of medical equivalence under Listing 11.02(D) requires "a detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms)," in addition to evidence of frequency, adherence to prescribed treatment, side effects, limitations in functioning, and "whether the overall effects of the primary headache disorder on functioning results in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself."  SSR

18

19-4p, 84 Fed. Reg. at 44667-71.  Ms. Hoskins has not identified a medical record containing "detailed description" of a typical headache event by an acceptable medical source during the alleged disability period.  Indeed, the treatment records she cites do not clearly indicate that she sought treatment for her migraines during that time, let alone that her migraines continued at her self-reported frequency despite adherence to treatment or resulted in marked limitations.

A review of the records cited by the parties and the ALJ reveals that during the relevant disability period, from December 2020 through December 2022, Ms. Hoskins's reports of headaches to providers were inconsistent at best and do not suggest that her headaches caused a "marked limitations in physical functioning" as Plaintiff suggests.  Many times, she reported no headache at all (*see, e.g.,* 565, 579, 1045, 2689, 3170), and when she did, it is often just noted in treatment notes as "positive for headache" without any indication of how much the headaches impacted her functioning (*see* Tr. 1022, 2329, 2320, 3023, 3145)).  She primarily relies on her 2023 testimony that she was having severe headaches twice a month that caused nausea and vomiting and necessitated removal to a dark, quiet room.  (ECF Doc. 13, p. 13 (citing Tr. 125-26).)  This testimony, without more, is insufficient to "raise[] a substantial question concerning whether the claimant could meet or equal the listing." *Heart*, 2022 WL 19334605, at *2.  Thus, the ALJ did not err by failing to explicitly discuss medical equivalency under Listing 11.02(D).

For the reasons set forth above, the undersigned concludes that the ALJ appropriately addressed medical equivalence as to migraine headaches under Listing 11.02 in accordance with the regulatory requirements and that Ms. Hoskins has not met her burden to demonstrate otherwise.  Accordingly, the undersigned finds the first assignment of error lacks merit.

**C.**     **Second Assignment of Error: Plaintiff Has Not Shown That the RFC Failed to Account for Migraine Limitations or Lacked the Support of Substantial Evidence**

In her second assignment of error, Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ failed to account for the functional limitations caused by her migraines.  (ECF Doc. 13, pp. 17-19.)  Specifically, she asserts that the RFC should have included limitations addressing time off task, absenteeism, phonophobia, or photophobia caused by her migraines.  (*Id.* at p. 17.)  The Commissioner responds that the evidence from the disability period supported the RFC finding and that Plaintiff's citations to records outside the period of disability are "merely an invitation to reweigh the evidence in her favor."  (ECF Doc. 15, pp. 9-11.)  Plaintiff replies that the ALJ was required to consider evidence from before and after the disability period and argues that the ALJ failed to consider evidence that did not support his decision.  (ECF Doc. 16, pp. 8-11.)

At Step Four of the sequential analysis, the ALJ acknowledged Ms. Hoskins's testimony that "she continues to have migraines, but they are not as bad," and that her migraines occurred "a couple times a month" and were "accompanied by light sensitivity and vomiting."  (Tr. 72.)  The ALJ also acknowledged that the evidence in the record included "objective test results and treatment notes" that were "dated prior to the claimant's amended alleged onset date of December 2, 2020" (*id.* (citing "B1F & portions of B2F, B3F, B4F, B5F, B8F, B9F, B15F, B18F, B21F & B24F")) and "dated after the claimant's date last insured of December 31, 2022" (*id.* (citing "B13F, B14F, B19F, B20F, B23F & B25F & portions of B15F & B18F")).  He then explained that he had "considered all evidence in the record" and adopted an RFC that "accommodates all limitations supported by the medical record as a whole for the time period in question," and "[s]pecifically . . . considered the claimant's history of migraines for which she has received nerve blocks in the past."  (Tr. 72-73 (citing Tr. 882-83 (8/10/18 neurology office

20

visit)).) Although he confirmed that he had considered records dating before and after the alleged disability period, the ALJ also found "a detailed analysis of the evidence dated prior to December 2, 2020, and after December 31, 2022, [wa]s unwarranted" because evidence from those times "does not provide pertinent information regarding the claimant's residual functional capacity during the relevant time[.]" (Tr. 72.) The ALJ then provided a two-paragraph summary of Plaintiff's treatment prior to the alleged onset date (Tr. 72-73), followed by a five-page summary of the treatment records and medical opinion evidence relating to the alleged disability period (Tr. 73-77). In analyzing the state agency medical consultants' opinions, the ALJ noted new evidence relating to foot impairments, rejected postural limitations in light of "no more than moderate musculoskeletal findings," observed that "treatment has been conservative during the relevant period" with "no indication in the record that invasive treatment is recommended for any of her conditions," and found the diffuse pain and tender points associated with Plaintiff's fibromyalgia and chronic pain syndrome were appropriately addressed by the RFC. (Tr. 76.)

In support of her argument that the ALJ "fail[ed] to account for all limitations resulting from migraines" in the RFC, Plaintiff again relies on treatment records that predate the alleged onset date by one or more years and her own testimony regarding her symptoms. (ECF Doc. 13, pp. 17-18 (citing Tr. 125-26, 604, 607, 882).)[4] Considering that the ALJ acknowledged Ms. Hoskins's testimony regarding her migraines and said he considered her migraine treatment before the alleged onset date, but also found treatment records predating the alleged onset date "do[] not provide pertinent information regarding the claimant's residual functional capacity during the relevant time" (Tr. 72), the undersigned finds Plaintiff has failed to show that the RFC lacked the support of substantial evidence or that the ALJ failed to consider her migraines.

---

[4] Plaintiff also relies on a treatment record from 2024 that was not in the evidentiary record before the ALJ at the time of his decision. (ECF Doc. 13, p. 17 (citing Tr. 14-15).)

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406) (quoting *Mullen*, 800 F.2d at 545).  While Plaintiff points to some evidence that may have supported additional migraine limitations, the Court "may not try the case *de novo*," *Garner*, 745 F.2d at 387, and may not overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

For all the reasons set forth above, the undersigned concludes that Ms. Hoskins has not met her burden to show that the ALJ lacked the support of substantial evidence when he adopted an RFC that did not include additional limitations relating to Plaintiff's migraine headaches. Accordingly, the undersigned finds the second assignment of error lacks merit.

**D.      Third Assignment of Error: The ALJ Properly Evaluated Plaintiff's Subjective Symptoms and Articulated an RFC Supported by Substantial Evidence**

In her third assignment of error, Plaintiff argues that the ALJ failed to properly evaluate her subjective symptoms under SSR 16-3p and that the RFC thus lacks the support of substantial evidence.  (ECF Doc. 13, pp. 19-22.)  In particular, Plaintiff argues that her complaints may support additional RFC limitations, like: (1) testimony that she cannot sit for a one hour program without position changes "would require a sit/stand option"; (2) testimony that it takes her three minutes to stand from a seated position "would require additional time for position changes or reduced productivity"; (3) testimony that she uses paper or plastic dishes because she drops them "would result in either occasional rather than frequent handling/fingering, or preclusion from handling small objects"; and (4) testimony that she elevates her legs while seated "would result in a leg elevation option."[5]  (*Id.* at p. 21 (citing Tr. 70-72).)  She argues that the ALJ "failed to

---

[5] Because Ms. Hoskins's arguments focus on subjective complaints that relate to her physical impairments, the analysis herein is also restricted to her physical impairments and the physical RFC.

explain any rejection of the aforementioned testimony," and therefore "violated SSR 16-3p's requirement for specific, evidence-based findings when discounting testimony." (*Id.*)

The Commissioner argues in response that the ALJ appropriately considered "multiple consistency factors" including the objective evidence, Plaintiff's course of treatment, and her activities of daily living before "crafting a fairly restrictive RFC . . . limiting Plaintiff to less than the full range of light exertional work." (ECF Doc. 15, p. 12.)  Because the ALJ "sufficiently considered Plaintiff's subjective complaints and drew conclusions supported by substantial evidence," the Commissioner argues the ALJ's findings should be upheld. (*Id.* at p. 13.)

**1.      Legal Standard for Evaluation of Subjective Symptoms**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed.

23

Reg. 49462, 49463; *Rogers*, 486 F.3d at 247. There is no dispute that the first step is met in this case (Tr. 24), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources. SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. § 404.1529(c)(3). Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3).

### 2. The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints

The ALJ found that Ms. Hoskins's medically determinable impairments could be expected to cause the alleged symptoms, but also found "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence of record." (Tr. 72.) Prior to that finding, the ALJ considered Ms. Hoskins's various subjective complaints at length. (Tr. 70-72.) With respect to the complaints highlighted in Plaintiff's brief, the ALJ considered testimony that: she has pain and numbness in her fingers due to fibromyalgia, with difficulty buttoning; Raynaud's makes "her hands and feet very sore, discolored, itch, ache and cause pain"; she "uses plastic or paper dishes/utensils because she drops them or lets go of them without realizing it"; she can walk up to 10 minutes before needing a break; plantar fasciitis and heel spurs "make her feel like she is standing on pins and needles or fire ants"; and "she typically sits with her legs elevated but cannot sit through an hour-long television show or a movie due to needing to get up and move around." (Tr. 71-72.)

In support of his finding that Plaintiff's subjective complaints "are not entirely consistent with the medical evidence and other evidence in the record," the ALJ considered objective test

24

results and treatment notes both prior to and during the alleged disability period. (Tr. 72-76.) Relevant to the limitations highlighted in Plaintiff's brief, the ALJ considered physical exam findings that noted tender points and diffuse muscle tenderness, some limitations in range of motion and motor strength, and/or an antalgic gait, but that were otherwise largely normal. (Tr. 73-75.) He acknowledged: her consistent reports of pain to providers; her treatment with pain medication and injections, with some improvement; and her apparent failure to follow up on referrals to physical therapy, orthopedics, and for dry needling. (Tr. 73-74.) He discussed hip x-rays showing some degenerative changes and mild osteoarthritis, an unremarkable brain MRI from 2019, and a shoulder MRI from 2020 showing a labral tear. (Tr. 73-75.) He found "the record shows a greater activity level than that to which the claimant testified" when Ms. Hoskins went to the hospital for an injury she suffered while giving a child a piggyback ride. (Tr. 74 (citing Tr. 571).) He also noted her report to a provider two months after the date last insured "that she was going to the gym and exercising 40 minutes a day." (Tr. 75 (citing Tr. 2975).)

The ALJ also considered and found partially persuasive the opinions of the state agency medical consultants, who opined that Ms. Hoskins could perform light work with limitations in climbing, postural positions, reaching, handling, fingering, and feeling, limited exposure to fumes and hazards, and near bathroom access. (Tr. 76, 187-88). The ALJ found some additional limitations were supported by Ms. Hoskins's shoulder and foot impairments, but that the record did not support postural limitations because "the objective imaging shows no more than moderate musculoskeletal findings with objective examinations being primarily benign with regard to the claimant's lumbar and hip complaints." (Tr. 76.) The ALJ also found the evidence did not support limitations to account for Ms. Hoskins's IBS or asthma, as those conditions had been well-managed without the need for urgent or invasive medical treatment. (Tr. 76-77.)

25

Finally, the ALJ again acknowledged Ms. Hoskins's subjective complaints and generally outlined the basis for his physical RFC determination:

> While the claimant has medically determinable impairments that could reasonably cause some of the symptoms and limitations, the allegations are considerably broader and more restricted than is established by the medical evidence. This is not to say that the claimant is symptom free or does not experience difficulty performing some tasks. The evidence does establish some limitations with respect to the claimant's physical and mental abilities. However, the record does not support the severe degree of limitation alleged. In sum, the claimant's physical impairments prevent her from performing work at greater than the light exertional level, with additional limitations on climbing ladders, ropes and scaffolds and using her upper extremities for reaching, operation of overhead controls, handling, fingering and feeling. The claimant is further limited to no foot controls and occasional operation of a motor vehicle. . . . I find that the objective evidence does not demonstrate the existence of limitations of such severity as to have precluded the claimant from performing all work on a regular and continuing basis at any time December 2, 2020, through her date last insured. Nevertheless, the claimant's impairments as a whole have all been accommodated for within the residual functional capacity assessment set forth above (SSR 16-3p).

(Tr. 77.)  Considering all of the findings detailed above, the undersigned concludes that the ALJ considered the factors in SSR 16-3p, clearly articulated how he considered the evidence in making his findings, and made a determination that was supported by substantial evidence.

With respect to the hand and foot conditions that were the primary focus of the complaints highlighted in Plaintiff's brief, the ALJ described relatively limited abnormal physical examination findings and clinical imagery—including "objective imaging [that] shows no more than moderate musculoskeletal findings with objective examinations being primarily benign with regard to the claimant's lumbar and hip complaints" (Tr. 76)—conservative treatment with some apparent failure to follow up, and some activities that were not consistent with the reported levels of limitation.  The ALJ then adopted a physical RFC that specifically accounted for limitations caused by Ms. Hoskins' foot and hand impairments.  (Tr. 69.)

26

Plaintiff initially argues that the ALJ improperly evaluated her testimony regarding her symptoms because he failed to "explicitly state or explain which part of Plaintiff's testimony was rejected and the reasons for such rejections." (ECF Doc. 13, p. 20.)  In her reply brief, she concedes that the ALJ "does not need to specifically indicate which parts of Plaintiff's testimony were rejected" (ECF Doc. 16, p. 7), but nevertheless maintains that "completely disregarding Plaintiff's testimony without a thorough analysis is not proper"[6] (ECF Doc. 16, p. 7; *see* ECF Doc. 13, p. 21 ("the ALJ did not provide a reason for rejecting Plaintiff's testimony.")).  On the contrary, the undersigned finds that the ALJ provided a detailed discussion of her subjective complaints (Tr. 70-72) followed by a detailed analysis to support his finding that her subjective complaints were not wholly credible (Tr. 72-77).

For all the reasons set forth above, the undersigned concludes that the ALJ appropriately addressed Ms. Hoskins's subjective complaints in accordance with regulatory requirements articulated in SSR 16-3p, and that Ms. Hoskins has not met her burden to demonstrate otherwise. The undersigned therefore finds the third assignment of error lacks merit.

---

[6] Plaintiff also asserts that since the ALJ "failed to explain any rejection of [her] testimony" said testimony was "implicitly credited." (ECF Doc. 13, p. 21; ECF Doc.16, p. 7 ("Without such an analysis, we can accept Plaintiff's statements as undisputed.").)  She cites no legal authority for this claim, and the undersigned is aware of none. Regardless, as the undersigned finds that the ALJ properly evaluated Plaintiff's subjective symptoms, Plaintiff's assertions that her testimony should be credited as true absent a "proper analysis" need not be addressed.

## V.      Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

July 30, 2026

_/s/Amanda M. Knapp_
AMANDA M. KNAPP
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).